IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

| | | |
|---|---|---|
| KURT W. DAVIS, | ) | Case No. 5:19-CV-02929-BYP |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | United States District Judge |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | CARMEN E. HENDERSON |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant, | ) | |

## I. Introduction

Plaintiff, Kurt Davis ("Davis" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

## II. Procedural History

On February 3, 2017, Claimant filed applications for DIB and SSI benefits, alleging a disability onset date of December 8, 2015, and claiming he was disabled due to a head injury caused by abuse he had suffered as an infant. The applications were denied initially and upon

1

reconsideration, and claimant requested a hearing before an administrative law judge ("ALJ").  On December 10, 2018, an ALJ held a hearing, during which Davis, represented by counsel, Davis's mother, and an impartial vocational expert testified.  (ECF No. 11 at 50-92).  On December 27, 2018, the ALJ issued a written decision finding Davis was not disabled.  (ECF No. 11 at 29-49).  The ALJ's decision became final on October 28, 2019, when the Appeals Council declined further review.  (ECF No. 11 at 5).

On December 19, 2019, Davis filed his Complaint to challenge the Commissioner's final decision.  (ECF No. 1).  The parties have completed briefing in this case.  (ECF Nos. 13, 16, and 17). Davis asserts the following assignments of error:

(1) The ALJ erred when he failed to properly evaluate the evidence in this matter; and

(2) The ALJ erred when he did not meet his burden at Step Five of the Sequential Evaluation.

(ECF No. 13 at 1).

### III. Background

#### A.  Relevant Hearing Testimony

##### 1.  Claimant's Testimony

During the hearing, claimant testified that he drives a car daily (ECF No. 11 at 73), grocery shops alone (ECF No. 11 at 74), and does his own laundry (ECF No. 11 at 76). He also testified, however, that his mom and dad assist him in various aspects of his daily life including accompanying him to his medical appointments (ECF No. 11 at 74), managing his phone and phone card (ECF No. 11 at 75), and managing his mail (ECF No. 11 at 75).

##### 2.  Claimant's Mother's Testimony

The ALJ summarized Mrs. Davis's testimony as follows:

> His mother indicated that his clothes are wrinkled, and he has poor hygiene. She stated they have to remind him to take medications, and they help with repairs at his apartment and other responsibilities. She stated he does not understand how to manage money. She noted a short attention span and difficulty following instructions. She stated he has been fired about twelve times (B4E).

(ECF No. 11 at 39).

### 3. Vocation Expert Testimony

During the hearing, the ALJ posed the following hypothetical to the vocational expert:

> Now, the first hypothetical individual is at the light exertional range, and he does have the  following additional limitations that he could never climb ladders, ropes, or scaffolds;  occasionally climb ramps and stairs; occasionally stoop, and crawl frequently, balance, kneel, and   crouch. This individual would need to avoid concentrated exposure to extreme cold, extreme heat, and humidity, as well as all exposure to hazards such as unprotected heights, and moving mechanical parts.
>
> He could perform simple, routine, repetitive tasks, but could not perform tasks at a production-rate pace such as assembly line work.
>
> He could make only simple work-related decisions, and should not be responsible for the safety or welfare of others.
>
> He could interact on an occasional basis with supervisors, and coworkers, with no more than incidental interaction with the general public; should be limited to superficial contact, meaning no sales, arbitration, negotiation, conflict resolution, or confrontation. No group, tandem, or collaborative tasks; no management direction, or persuasion of others.
>
> Now, he could respond appropriately to occasional changes in a routine work setting, as well as any changes that were easily explained and/or demonstrated at best to gradual implementation.

(ECF No. 11 at 87-88). The vocational expert testified that such a person would not be able to perform claimant's past relevant work but that there are significant jobs in the national economy which such a person could perform including a marker (200,000 nationally), inspector/tester/sorter (60,000 nationally), and router (50,000 nationally). (ECF No. 11 at 88-89).

In a second hypothetical, the ALJ presented the same limitations as in the first hypothetical, but refined the social interaction as follows: "He could still occasionally interact with supervisors. Otherwise, would have to work in isolation with no contact with either the general public, or coworkers." (ECF No. 11 at 89). The vocational expert testified that such a person would not have the ability to perform the previously mentioned jobs and that such restrictions would require an accommodation that is not realistic in "today's competitive job market." (ECF No. 11 at 89). The vocational expert allowed for an off-task rate of below 15% and an absentee rate of no more than one day per month. (ECF No. 11 at 89).

## B. Relevant Medical Evidence

The ALJ summarized Plaintiff's mental health records and symptoms:

> The claimant was abused as an infant and sustained a closed skull fracture for which he underwent surgery. He had an IQ of 81 in school and graduated from high school in Special Education (Bl4F), and he has a solid work history until 2012. NeuroCare records from January 2015 note that the claimant had ADHD as a child that has kept him from concentrating effectively. However, he does not take any medications for it. The claimant also reported being slow with learning to do new stuff. He stated he could follow a task after watching it completed, but he cannot learn to do something on his own. He denied depression and anxiety. He was administered testing at that time, which demonstrated that his neuropsychological functioning was fairly well preserved. On the Cognitive Capacity Screening Inventory, he correctly responded to 27 of 30 items. He was able to provide information regarding place, time, and person, as well as short-term recall of numbers and simple manipulation requiring concentration. He had difficulties with Serial 7s, but he was able to work it out using his fingers. He had trouble with vocabulary and abstract reasoning, but the psychologist felt that he did not give his best effort, and he obviously prefers more action-oriented kinds of things rather than passive activities such as these. Results of the Symptoms Checklist 90-revised were entirely within the normal range, with no elevations on somatization, obsessive compulsive, sensitivity, anxiety, hostility, paranoia, or psychosis (B2F/12)[.]
>
> […]

He has not had any mental health treatment since the alleged onset date.  He had a psychological consultative evaluation on April 26, 2017.  At that time, he reported difficulties working due to left-sided weakness and problems with concentration.  He reported he resides along [sic], but his parents help him with most chores and finances and see him on "most days".  He reported working at a dairy farm for four years, but he cut his thumb, and his physician would not release him to go back to work soon enough, and as a result he was fired.  He reported being medicated for ADHD in the past.  He stated his daily activities include taking a walk and watching television.  He reported he does his own cooking, cleaning, laundry, and shopping.  However, his parents indicate he requires assistance in most of these areas (B6F/2-3).

At the evaluation, he presented with adequate hygiene and grooming and he had adequate eye contact. He had problems with comprehension and concentration. He described his mood as okay and denied long periods of depression or anxiety. Other than being fidgety, he did not display overt signs of anxiety.  He was alert and oriented, and there was no evidence of delusions, paranoia, obsessive-compulsive behaviors, nightmares, or flashbacks.  He reported he forgets what people tell him. The examiner estimated his intelligence to fall in the extremely low range, although there was no formal intelligence testing administered. The examiner diagnosed ADHD, cognitive disorder, NOS and mild mental retardation (B6F/3-5).  In November 2018, he reported no symptoms of depression (B15F/1).  He was noted to be alert and cooperative, with normal mood and affect, and normal attention span and concentration (B15F/3). He has no treatment for ADHD or cognitive disorder.

(ECF No. 11 at 39-41).

## C.  Opinion Evidence at Issue

### 1.  State Agency Consultants

The State Agency psychological consultants, Juliette Savitscus, Ph.D. and Katherine

Reid, Psy,D, opined that:

claimant can perform simple, routine tasks with 1-3 steps, in a work environment free of fast paced production requirements, with only occasional superficial contact with others and no arbitration, negotiation, confrontation, directing the work of others, persuading

> others, or being responsible for the safety or welfare of others, with
> only occasional changes that can be explained (B3A/B4A;
> B7A/B5A).

(ECF No. 11 at 41). The ALJ gave these opinions considerable weight, noting that they are from

"acceptable medical sources with program knowledge" and that the opinions are "largely

consistent with the record[.]" (ECF No. 11 at 41). The ALJ, however, found that claimant "is

further limited to incidental contact with the public and only simple decisions based on the

claimant's memory issues." (ECF No. 11 at 41).

### 2.  Robert Dallara, Jr., PhD - April 26, 2017

On April 26, 2017, Dr. Robert Dallara, Jr. performed a psychological examination on

claimant. (ECF No. 11 at 554-558). The ALJ summarized Dallara's opinion as follows:

> claimant would be expected to be able to understand and apply
> instructions in a work setting consistent with extremely low
> intellectual abilities. He noted no direct evidence during the exam
> to suggest impairments to his persistence and pace; however, he did
> have difficulties with comprehension and concentration at times,
> and this would likely prompt performance concerns by others.  As a
> result of concentration issues and lowered intellectual abilities, he
> may have difficulties relating to others, including fellow workers
> and supervisors. Due to concentration issues, low intellectual
> functioning, and cognitive difficulties, he would have problems
> withstanding stress and pressures associated with day-to-day work
> activity (B6F).

(ECF No. 11 at 41-42).  The ALJ gave Dallara's opinion great weight explaining that "it is from

an acceptable medical source who examined the claimant, and the opinion is consistent  with the

record in limiting the claimant to unskilled work with no production rate pace, minimal

interaction, and low stress, including limited decision making and only occasional changes." (ECF

No. 11 at 42).

### 3.  Lindsey Foradis, FNP-C – March 1, 2017

The ALJ summarized Foradis's opinion as follows:

> Treating nurse practitioner, Lindsey Foradis, FNP-C indicated on March 1, 2017 that the claimant's ability to remember locations and work-like procedures and ability to understand and remember detailed instructions is markedly limited. His ability to carry out detailed instructions, maintain attention and concentration for extended periods, and perform activities within a schedule, etc. was markedly limited. She indicated his ability to accept instructions and respond appropriately to criticism from supervisors and ability to maintain socially appropriate behavior, etc. was markedly limited. She indicated his ability to respond appropriately to changes in a work setting, etc. was markedly limited (B8F/2-3). She also indicated on March 27, 2017 that the claimant is "unable to work or support himself due to a traumatic brain injury he sustained as an infant. This is considered a permanent disability" (B8F/l).

(ECF No. 11 at 42). The ALJ gave Foradis's opinion little weight explaining that she is not an acceptable medical source and addressed an issue reserved for the Commissioner. (ECF No. 11 at 42). Additionally, the ALJ explained that:

> the statements are inconsistent with the record, including NP Foradis' examination findings, and are inconsistent with the claimant's past ability to maintain work activity.  It appears that NP Foradis only saw the claimant two times before filling out the form and writing the letter, on February 14, 2017, and on March 1, 2017. It appears to be based entirely on the claimant's February 14, 2017 request for a letter stating he cannot work, at which time NP Foradis requested records from NeuroCare and psychiatry (B5F/4).  At the follow up wellness examination on March 1, 2017, the claimant reported no current complaints, and his physical examination was normal.  He was only treated for impacted cerumen and advised of diet and exercise (B7F/6-7).

(ECF No. 11 at 42).

## IV.   The ALJ's Decision

The ALJ acknowledged claimant's prior applications for DIB and SSI filed in November of 2013, which alleged a period of disability beginning August 19, 1981 through present. The ALJ explained that the previous ALJ's December 7, 2015 decision concerning claimant's residual functional capacity is binding absent evidence of an improvement or change in condition since the

prior hearing. (ECF No. 11 at 32 (citing *Drummond* v. *Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir.

1997)). The ALJ further explained that "claimant submitted new evidence, which shows a new

and material change in circumstances beginning December 8, 2015.  As such, I am not bound by

the findings of the previous ALJ as of that date." (ECF No. 11 at 32).

The ALJ then made the following findings relevant to this appeal:

> 3.    The claimant has the following severe impairments: Attention-deficit hyperactivity disorder (ADHD); Cognitive disorder; Developmental    disorder; Memory loss; Post- surgical change involving  right parietal lobe and foreign body along inferior margin of left orbit status post history of  traumatic brain injury (TBI); Syncope and  collapse, and  other seizures; Sacroiliitis with low back pain; Osteoarthritis of left hip, foot and  ankle; Atherosclerotic coronary artery disease  (CAD) and  non-rheumatic  mitral valve prolapse; Emphysema; and Obesity (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.    The  claimant does not have an impairment or combination of impairments that meets or  medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,  Appendix 1 (20 CFR  404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5.    After careful consideration of the entire record, I find that the claimant has the residual  functional capacity to perform light work as defined in 20 CFR  404.1567(b) and 416.967(b) except:  Never climb ladders, ropes and scaffolds, occasionally climb ramps and stairs, occasionally stoop  and crawl, frequently balance, kneel and crouch.  He must avoid concentrated exposure to extreme cold and extreme heat, humidity, and avoid all exposure to hazards such as unprotected heights and moving mechanical parts.  He can perform simple, routine and repetitive tasks, but cannot perform tasks at a production rate pace such as assembly line work, can make only simple work related decisions, and should not be responsible for the safety or welfare of others.  He can  interact on an occasional basis with supervisors and coworkers, with no more than incidental interaction with the   general public, but should be limited to superficial contact meaning no  sales, arbitration, negotiation, conflict  resolution or confrontation, no group, tandem or collaborative tasks, no management, direction or  persuasion of others.  He can respond appropriately to occasional changes in a routine work  setting, as long as any such changes are easily

explained and/or demonstrated to him prior to gradual implementation.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 8, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**B. Discussion**

Plaintiff raises two issues on appeal: 1) that the ALJ erred by failing to properly evaluate the evidence; and 2) that the ALJ did not meet his burden at step five. Within the first issue, claimant makes several arguments: that the ALJ failed to recognize marked limitations, thereby failing to find that claimant met Listing 12.05; that the ALJ failed to consider – or gave too little consideration to – Mrs. Davis's hearing testimony; and that the ALJ failed to give proper weight to Foradis's opinion by failing to recognize it as an opinion from a treating source.

**1. The ALJ properly evaluated the evidence.**

**a. Treating source rule.**[1]

Under the treating source rule, an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (eff. to July 31, 2006)[3])). "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record." SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the

---

[1] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017.  See 20 C.F.R. § 416.927. Plaintiff filed his claim before the revision took effect.

treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2) (eff. Aug. 24, 2012). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson*, 378 F.3d at 544). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

Foradis, a nurse practitioner, is not treating medical source. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (citing 20 C.F.R. § 404.1513 (1997)). An "ALJ has discretion to determine the proper weight to accord opinions from 'other sources' such as nurse practitioners." *Id.* Claimant understands this and does not argue that Foradis is a treating source. Instead, he argues that her opinion is a treating source opinion because it was cosigned by Dr. Delia Slaga. (ECF No. 13 at 17).

Under the SSA's regulations, "a 'treating source' is any 'acceptable medical source,' including a licensed medical physician, who has an 'ongoing treatment relationship' with the claimant." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 551 (6th Cir. 2020) (quoting 20 C.F.R.

11

§§ 404.1502(a)(1); 404.1527(a)(2)); *see also Gayheart*, 710 F.3d at 375 (describing a "treating source" as "a medical source who regularly treats the claimant"). "As the regulations make clear, an ongoing treatment relationship must be based on an individual's 'medical need for treatment or evaluation,' and cannot be based 'solely on [the] need to obtain a report in support of [a] claim for disability.'" *Id.* (*quoting* 20 C.F.R. § 404.1527(a)(2)). "Similarly, we have held that visiting a doctor once or twice does not create an ongoing treatment relationship." *Id.* (*citing Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).

Here, there is no indication that Slaga had an ongoing treatment relationship with Claimant. The form containing Foradis's opinion indicates Claimant's last exam occurred six months prior on March 1, 2017. (ECF No. 11 at 598). Claimant's medical records from March 1, 2017 show that he met with Foradis with no mention of Slaga. (ECF No. 11 at 565). In fact, none of Claimant's encounters at Pediatric and Family Medicine Healthcare, Inc. indicate that he had ever treated with Slaga. (*See* ECF No. 11 at 567 (signed by Foradis), 569 (signed by Joel Lupisan Kerwin, M.D.)). Additionally, there is nothing in the record indicating that Slaga participated in the assessment completed by Foradis other than signing in the address box on the last page of the form. Accordingly, substantial evidence demonstrates that Slaga was not a "treating source".

Claimant's reliance on *Hargett* in support of the assertion that this matter should be remanded for consideration as the form was cosigned by Slaga is misplaced. In *Hargett*, no one disputed that the doctor who cosigned the report had an ongoing treatment relationship with the claimant. (964 F. 3d at 551). The evidence there demonstrated that the physician had treated the claimant at least six times for various ongoing medical conditions. (*Id.* at 551). The Court found "no reason to doubt that [the doctor] was a treating source with respect to [the claimant]. *Id.* at

12

551–52. Here, there is simply nothing in the record indicating that Slaga ever treated Claimant, let alone treated him enough to qualify as a treating source.

Accordingly, substantial evidence supports the ALJ treating Foradis's opinion as an opinion from a non-treating source.

Foradis is not an acceptable "medical source"; thus, her opinion is not entitled to controlling weight and the ALJ has the discretion to determine the appropriate weight to accord her opinion based on all evidence in record. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). An "ALJ is only required to 'explain the weight given to opinions from' non-acceptable medical sources and non-medical sources." *MacPhee v. Saul*, No. 1:19-CV-711, 2020 WL 4057548, at *2 (N.D. Ohio July 20, 2020) (*quoting* 20 C.F.R. § 404.1527(f)(2) (2017)). "Still, the ALJ must consider all relevant evidence in an individual's case record." *Id.* (*citing Gayheart*, 710 F.3d at 378). "Therefore, the ALJ 'should explain the weight given to opinions from [non-acceptable medical sources and non-medical sources] or otherwise ensure that the discussion of the evidence in the determination or decision allows a plaintiff or subsequent reviewer to follow the adjudicator's reasoning, when such opinion may have an effect on the outcome of the case.'" *Id.* (*quoting* SSR 06–03P, 2006 WL 2329939, at *6 (Aug. 9, 2006) (rescinded) (emphasis omitted)). The ALJ must weigh opinion evidence based on the "facts in each case" and "adjudicate[] [the claim] on its own merits based on a consideration of the probative value of the opinions." SSR 06-03p. The ALJ may consider six guiding factors: (1) the length and frequency of the relationship; (2) the opinion's consistency with other admitted evidence; (3) the opinion's supporting evidence; (4) the opinion's explanation; (5) the provider's specialty or area of expertise related to the individual's impairments; and (6) any other factors that tend to support or refute the opinion. SSR 06-03p. The ALJ need only consider the relevant factors; if he does so, and substantial evidence

supports the weight he afforded to the evidence, then the ALJ's weight determination will stand. SSR 06-03p.

The ALJ's decision shows that he considered the guiding factors in SSR 06-03p and the entirety of the record when he gave Foradis's statements little weight. The ALJ explained that Foradis's statements:

> are not from an acceptable medical source, and they addresses [sic] an issue reserved for the Commissioner. Further, the statements are inconsistent with the record, including NP Foradis' examination findings, and are inconsistent with the claimant's past ability to maintain work activity. It appears that NP Foradis only saw the claimant two times before filling out the form and writing the letter, on February 14, 2017, and on March 1, 2017. It appears to be based entirely on the claimant's February 14, 2017 request for a letter stating he cannot work, at which time NP Foradis requested records from NeuroCare and psychiatry (BSF/4). At the follow up wellness examination on March 1, 2017, the claimant reported no current complaints, and his physical examination was normal. He was only treated for impacted cerumen and advised of diet and exercise (B7F/6-7).

(ECF No. 11 at 42).

Accordingly, the ALJ sufficiently discussed the evidence and explained his decision to give Foradis's opinion little weight in a manner that allows the subsequent reviewer to follow his reasoning.

### b. Testimony of Mrs. Davis.

Claimant argues that the ALJ failed to give enough consideration to the testimony of his mother, Mrs. Davis. Claimant argues that Mrs. Davis "testified as to specific limitations her son had with hygiene, comprehension, and memory[,]" but that "the ALJ only briefly mentioned that [she] testified and noted that Davis had a 'short attention span and difficulty following instructions.'" (ECF No. 13 at 16-17).

Mrs. Davis is a "non-medical source". *See* 20 C.F.R. § 404.1513(a)(4). Opinions expressed

14

by non-treating sources such as a claimant's mother are not entitled to any deference and the ALJ is not required to articulate good reasons for discounting them. *See, e.g., Smith*, 482 F.3d at 876. Instead, the ALJ is simply required to consider the lay opinions and accord them the weight he finds appropriate. *See, e.g., Engebrecht v. Comm'r of Soc. Sec.*, 572 F. App'x. 392, 397–98 (6th Cir. 2014). "If lay witness testimony is provided, the ALJ cannot disregard it without comment, and must give reasons for not crediting the testimony that are germane to each witness." *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) (citation omitted).

Mrs. Davis's opinions as to the abilities and functionality of claimant are not entitled to any deference. Despite claimant's assertion to the contrary, substantial evidence supports a finding that the ALJ properly considered Mrs. Davis's testimony. For example, the ALJ specifically summarized Mrs. Davis's testimony regarding claimant's personal hygiene and appearance. (ECF No. 11 at 39). The ALJ also recounted Mrs. Davis's testimony that claimant needs to be reminded to take his medications, requires assistance with repairs to his apartment and other responsibilities, and does not know how to manage money. (ECF No. 11 at 39). Finally, the ALJ noted that Mrs. Davis opined that claimant has a short attention span, has difficulty following directions, and has been fired from twelve jobs. (ECF No. 11 at 39). Although the ALJ did not restate Mrs. Davis's entire testimony[2], the record clearly and sufficiently indicates that he considered the totality of her testimony in reaching his decision. Accordingly, the record demonstrates that the ALJ did not disregard Mrs. Davis's testimony.

### c. Listing 12.05 analysis

Listing 12.05 addresses intellectual disorders and sets forth two paths for satisfying the

---

[2] For example, the ALJ does not mention Mrs. Davis's testimony that although claimant drives, he has been in at least three wrecks.

requirements.  Under Paragraph A, a claimant must show each of the following:

> 1.  Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and
>
> 2.  Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and
>
> 3.  The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

(20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05(A)).  Under Paragraph B, a claimant must show each

of the following:

> 1.  Significantly subaverage general intellectual functioning evidenced by a or b:
>     a.  A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
>     b.  A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and
>
> 2.  Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>     a.  Understand, remember, or apply information (see 12.00E1); or
>     b.  Interact with others (see 12.00E2); or
>     c.  Concentrate, persist, or maintain pace (see 12.00E3); or
>     d.  Adapt or manage oneself (see 12.00E4); and
>
> 3.  The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

(20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05(B)).

The ALJ examined the evidence and analyzed it under both Paragraph A and B and found

16

that claimant's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of [listing 12.05]." (ECF No. 11 at 36). Claimant argues that the ALJ erred in his finding with respect to Paragraph B in two ways: 1) by failing to recognize claimant's IQ score of 71; and 2) by failing to find marked limitations in at least two of the functional domains. The Commissioner argues Claimant did not prove an IQ score of 71, but that even if he had, that alone does not meet the requirements of Paragraph B, and that Claimant failed to prove marked limitations in two of the functional areas. Substantial evidence supports the ALJ's determination.

Assuming for the sake of argument that the ALJ erred by failing to recognize that Claimant's IQ score is 71, Claimant still does not meet the listing requirements because he has not demonstrated marked limitations in two or more functional areas as required under 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05(B)(2).[3] In order to meet Paragraph B requirements, Claimant must demonstrate each of the three subparagraphs. Failure to qualify under even one of the subparagraphs disqualifies him from meeting the listing. Here, substantial evidence supports the ALJ's finding that Claimant does not have marked limitations in two or more functional areas.

A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(F)(2)(d). A moderate limitation means functioning in this area independently,

---

[3] Because the undersigned finds that Claimant's issue has no merit even assuming an error in relation to the IQ score, we need not determine the merits of that error. However, after reviewing the evidence, the undersigned also finds that substantial evidence supports the ALJ's determination that Claimant does not meet the requirements under 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05(B)(1). Although the State Agency reviewing psychologists noted a suggestion of a full-scale IQ of 71, there is no record of any such testing that produced that score. Additionally, there is no record of any accompanying verbal or performance scale IQ score, which is a requirement under §12.05(B)(1). In fact, the only such test scores provided were from a test conducted when Claimant was in school and resulted in a full-scale IQ score of 81, with a verbal-scale IQ of 83 and performance-scale IQ of 81. (ECF No. 11 at 678). Accordingly, this argument also has no merit.

appropriately, effectively, and on a sustained basis is fair. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(F)(2)(c).

Claimant argues that his mother's testimony supports his argument for marked functional limitations. (ECF No. 13 at 15). Mrs. Davis stated that claimant: is like a 5-year old child; drives a car but has been in three wrecks and does not understand one-way streets; requires the assistance of his parents to attend to his mail; cannot budget appropriately for food, and; fails to keep his apartment clean or engage in proper hygiene. (ECF No. 13 at 15). Additionally, Dr. Dallara opined that Claimant had intellectual functioning in the extremely low range and had diagnoses of both cognitive disorder and mild mental retardation. Claimant argues that Dr. Dallara's observations are supported by the school records which note that Claimant had difficulty keeping his attention on tasks at hand and working independently and suffered significant weakness in short-term auditory memory and concentration skills. (ECF No. 13 at 14).

On the other hand, the evidence demonstrates that Claimant has a valid driver's license and drives on a daily basis, cooks meals for himself, does his own laundry, engages with others socially, emotionally, and through gaming, and is able to adequately communicate to his physicians. Although Mrs. Davis opined that Claimant had hygiene issues, the record evidence shows that he has proper self-care and personal hygiene.

Dr. Dallara opined that Claimant insight and judgment appear "somewhat limited"; Claimant would be expected to be able to understand and apply instructions in a work setting consistent with extremely low intellectual abilities; there was no direct evidence suggesting impairment to his persistence or pace but that he had difficulties with comprehension and concentration at times; and Claimant made "unremarkable social presentation" but may have difficulties relating to others given his concentration issues and lowered intellectual abilities. (ECF

18

No. 11 at 557-558). Additionally, Dr. Dallara noted: "The informants indicate that the claimant did have treatment by mental health professionals as a child.  He did not report a pattern of inability to adjust to workplace demands; however his parents did indicate that he was often overwhelmed at work due to comprehension issues. Due to his concentration issues, extremely low intellectual functioning, and cognitive difficulties, he would have problems withstanding stress and pressure associated with day-to-day work activity." (ECF No. 11 at 558). The ALJ gave Dallara's opinion great weight and stated: "it is from an acceptable medical source who examined the claimant, and the opinion is consistent with the record in limiting the claimant to unskilled work with no production rate pace, minimal interaction, and low stress, including limited decision making and only occasional changes." (ECF No, 11 at 42).

Additionally, both state agency reviewing psychologists, Drs. Savitscus and Reid, opined that claimant had had moderate limitations in the following psychological areas: understanding and remembering detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday or workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work setting. (ECF No. 11 at 181-182, 221-222). The ALJ gave these opinions considerable weight and claimant does not challenge the given weight.

Based on the above, substantial evidence supports the ALJ's decision that Claimant's ability to function independently, appropriately, effectively, and on a sustained basis is fair, and not seriously limited as required for a "marked limitation" finding.

19

Finally, the ALJ adequately explained the evidence supporting each of his functional area

determinations:

> In understanding, remembering, or applying information, the claimant has moderate limitations. The claimant alleged that he has difficulty remembering generally, understanding what is said to him, following instructions, paying bills, going to doctor's appointments without reminders, and taking medications without reminders. However, the claimant also stated that he could perform simple maintenance, prepare meals, go to doctor's appointments, take medications, shop, drive, read, and play games. In addition, the record shows that the claimant was able to provide information about his health, describe his prior work history, follow instructions from healthcare providers, and respond to questions from medical providers.
>
> In interacting with others, the claimant has moderate limitations. Here, the claimant alleged that he has difficulty getting along with others and dealing appropriately with authority. However, according to his statements, the claimant is also able to get along with others, shop, spend time with friends and family, and deal appropriately with authority. Finally, the medical evidence shows that the claimant had a good rapport with providers, was described as pleasant and cooperative, had good interactions with non-medical staff, and appeared comfortable during appointments.
>
> The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has moderate limitations. The claimant contended that he has limitations in concentrating generally, focusing generally, and following instructions. On the other hand, the claimant said that he is also able to drive, prepare meals, watch TV, read, play games, and handle his own medical care.
>
> Finally, the claimant has moderate limitations in his ability to adapt or manage himself. The claimant asserted that he has difficulties managing his mood. That said, the claimant also stated that he is able to handle self-care and personal hygiene. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, no problem getting along well with providers and staff, normal mood and affect, and no problems with temper control.

(ECF No. 11 at 36-37).

Accordingly, the medical and testimonial evidence indicate that Claimant did not exhibit serious deficiencies in adaptive functioning, and thus supports the ALJ's conclusion that Claimant did not meet or equal Listing 12.05(B).

### 2.  Substantial evidence supports the ALJ's finding at step five.

Prior to determining that Claimant could not perform his past relevant work at step four, the ALJ determined Claimant's RFC. The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). Here, the ALJ determined Claimant's RFC as follows:

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: Never climb ladders, ropes and scaffolds, occasionally climb ramps and stairs, occasionally stoop and crawl, frequently balance, kneel and crouch.  He must avoid concentrated exposure to extreme cold and extreme heat, humidity, and avoid all exposure to hazards such as unprotected heights and moving mechanical parts. He can perform simple, routine and repetitive tasks, but cannot perform tasks at a production rate pace such as assembly line work, can make only simple work related decisions, and should not be responsible for the safety or welfare of others.  He can  interact on an occasional basis with supervisors and coworkers, with no more than incidental interaction with the  general public, but should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or  collaborative tasks, no management, direction or persuasion of others. He can respond appropriately to occasional changes in a routine work setting, as long as any such changes are easily explained and/or demonstrated to him prior to gradual implementation.

ECF No. 11 at 38. When supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek v. Comm'r*

21

*of Soc. Sec.,* 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen*, 800 F.2d at 545.

Claimant does not assert an error in the ALJ's RFC determination at the proper point in the sequential analysis. Instead, Claimant improperly attempts to attack the RFC at step five by arguing that the ALJ failed to take into consideration any of the limitations as set forth by Foradis[4], the school records, the observations of other doctors, or the testimony of his mother. Claimant also asserts that the RFC did not reflect additional hypotheticals posed by the ALJ to the vocational expert including potential off-task, absenteeism, and need to work in something approaching isolation from peers. (ECF No. 13 at 23).[5] The Commissioner does not have the burden to determine the RFC at step five.

Rather, at step five the Commissioner has the burden of proof to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). "The step five analysis is meant to determine, given the severity of the impairments *already proven*, whether there are jobs in the economy which a claimant can perform." *Id.* (emphasis added). If a Claimant has not established limitations to be included in an RFC by step four, the burden does not shift to the Commissioner to prove an RFC – or its

---

[4] Claimant suggests the limitations were set forth by Slaga, but as discussed above, there is no indication that Slaga ever treated Claimant or took part in the assessment form filled out by Foradis.

[5] To the extent Claimant intended to assert an error in the RFC instead of or in addition to an error at step five, it would fail. As discussed above, the ALJ gave proper weight to Foradis's opinion, considered his school records and tests, considered and fully explained the weight given to the other doctors' opinions, and considered his mother's testimony. The ALJ's decision whether or not to include limitations based on all of the evidence is supported by substantial evidence and reasonably drawn from the record. *See Mullen*, 800 F.2d at 545.

limitations – at step five. *Id.* at 392. Thus, Claimant's attempt to shift the burden of proving the RFC onto the Commissioner at step five is improper.

Moreover, the Commissioner properly met his burden to determine that there is work available in the economy that the claimant can perform at step five. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation marks and citation omitted). "This substantial evidence may be in the form of vocational expert testimony in response to a hypothetical question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Baker v. Barnhart*, 182 F. App'x 497, 500 (6th Cir. 2006) (citations and internal quotation marks omitted). The Commissioner met this burden through the testimony of the vocational expert, who testified that work exists in the national economy that accommodates Claimant's RFC and vocational factors. Therefore, the ALJ found that he is not disabled.

During the hearing, the ALJ posed the following hypothetical:

> Now, the first hypothetical individual is at the light exertional range, and he does have the following additional limitations that he could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally stoop, and crawl frequently, balance, kneel, and crouch. This individual would need to avoid concentrated exposure to extreme cold, extreme heat, and humidity, as well as all exposure to hazards such as unprotected heights, and moving mechanical parts.
>
> He could perform simple, routine, repetitive tasks, but could not perform tasks at a production-rate pace such as assembly line work.
>
> He could make only simple work-related decisions, and should not be responsible for the safety or welfare of others.
>
> He could interact on an occasional basis with supervisors, and coworkers, with no more than incidental interaction with the general public; should be limited to superficial contact, meaning no sales,

> arbitration, negotiation, conflict resolution, or confrontation. No group, tandem, or collaborative tasks; no management direction, or persuasion of others.
>
> Now, he could respond appropriately to occasional changes in a routine work setting, as well as any changes that were easily explained and/or demonstrated at best to gradual implementation.

(ECF No. 11 at 87-88). The vocational expert testified that such a person would not be able to perform Claimant's past relevant work but that there are significant jobs in the national economy which such a person could perform.

In a second hypothetical, the ALJ presented the same limitations as in the first hypothetical, but refined the social interaction to limit his interaction with supervisors to an occasional basis and otherwise "work in isolation with no contact with either the general public, or coworkers." (ECF No. 11 at 89). The vocational expert testified that such a person would not have the ability to perform the previously mentioned jobs and that such restrictions would require an accommodation that is not realistic in "today's competitive job market." (ECF No. 11 at 89). The vocational expert allowed for an off-task rate of below 15% and an absentee rate of no more than one day per month. (ECF No. 11 at 89).

The hypothetical posed by the ALJ to the vocational expert properly included Claimant's limitations that the ALJ found were supported by the record. Although the ALJ raised with the vocational expert additional limitations pertaining to a second hypothetical, the ALJ concluded that these limitations did not apply to Claimant, which was supported by substantial evidence and within his "zone of choice". The vocational expert testified that there were approximately 310,000 jobs nationwide available to someone with Claimant's vocational profile, including the restrictions the ALJ found supported by the record as a whole. (ECF No. 11 at 88-89).

Accordingly, the hypothetical question accurately portrayed claimant's individual physical

and mental impairments; thus, substantial evidence supports the ALJ's finding that work is available in the economy that the claimant can perform. *Baker*, 182 F. App'x at 500.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

DATED:  12/14/2020

 s/*Carmen E. Henderson*
Carmen E. Henderson
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas* v. *Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).